**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

**CASE NO. 22-12536**

_____

TERESA BOYD,

*Plaintiff/Appellant*,

v.

LOUIS DEJOY, in his official capacity as
POSTMASTER GENERAL OF THE UNITED STATES,

*Defendant/Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
HONORABLE ALLEN WINSOR
(4:21-cv-00234-AW-MAF)

_____

**APPELLANT'S INITIAL BRIEF**

_____

Marie A. Mattox
Ashley N. Richardson
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
(850) 383-4800
(850) 383-4801 (facsimile)
marie@mattoxlaw.com
ashley@mattoxlaw.com

**C-1**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant/Plaintiff, Teresa Boyd, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files her Certificate of Interested Persons and Corporate Disclosure Statement:

1.  Teresa Boyd (Plaintiff/Appellant)

2.  Louis Dejoy (Defendant/Appellee)

3.  DOJ-USAO (Law Firm for Appellee)

4.  Martin A. Fitzpatrick (Magistrate Judge)

5.  Herbert Stanley Lindsey (Counsel for Appellee)

6.  Marie A. Mattox (Counsel for Appellant)

7.  Marie A. Mattox, P.A. (Law Firm for Appellant)

8.  Allen C. Winsor (District Court Judge)

**C-2**

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that oral argument will assist the Court's disposition of this case.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT ......................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..........................................C-2

TABLE OF CONTENTS............................................................................................i

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF JURISDICTION....................................................................... vii

STATEMENT OF THE ISSUES...............................................................................1

STATEMENT OF THE CASE ..................................................................................2

STATEMENT OF THE FACTS ...............................................................................3

STANDARD OF REVIEW ......................................................................................13

SUMMARY OF ARGUMENT ...............................................................................13

ARGUMENT .........................................................................................................14

    I.    THE DISTRICT COURT ERRED BY GRANTING
        SUMMARY JUDGMENT ON BOYD'S DISCRIMINATION
        CLAIMS, FINDING THAT SHE DID NOT ESTABLISH A
        PRIMA FACIE CASE FOR EACH PROTECTED CLASS..............16

        A.    The District Court erred by granting summary judgment
              on Boyd's race, sex, and age discrimination claims.................16

        B.    The District Court erred by granting summary judgment
              on Boyd's disability discrimination claim. ...............................20

    II.    THE DISTRICT COURT ERRED BY GRANTING
         SUMMARY JUDGMENT ON BOYD'S RETALIATION
         CLAIM. ..............................................................................................27

CONCLUSION ........................................................................................44

CERTIFICATE OF COMPLIANCE .......................................................45

CERTIFICATE OF SERVICE ................................................................45

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986).....................................................14

<u>Araujo v. N.J. Transit Rail Operations, Inc.</u>, 708 F.3d 152 (3rd Cir. 2013)............34

<u>Babb v. Wilkie</u>, 140 S. Ct. 1168 (2020) .................................................16, 18, 27, 28

<u>Babb v. Sec'y, Dep't of Veterans Affs.</u>, 992 F.3d 1193 (11th Cir. 2021).........17, 30

<u>Brown v. Snow</u>, 440 F.3d 1259 (11th Cir. 2006) .....................................................16

<u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 53 (2006)............................29, 35

<u>Burton v. City of Belle Glade</u>, 178 F.3d 1175 (11th Cir. 1999)..............................14

<u>Cash v. Smith</u>, 231 F.3d 1301 (11th Cir. 2000).......................................................20

<u>Clemons v. Dougherty County</u>, 684 F.2d 1365 (11th Cir. 1982) ...........................15

<u>Cottrell v. Caldwell</u>, 85 F.3d 1480 (11th Cir. 1996).................................................14

<u>Crawford v. Carroll</u>, 529 F.3d 961 (11th Cir. 2008).................................................29

<u>D'Angelo v. ConAgra Foods, Inc.</u>, 422 F.3d 1220 (11th Cir. 2005)........................20

<u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).....................................................34

<u>Downing v. United Parcel Service, Inc.</u>, 215 F.Supp.2d 1303 (M.D. Fla 2002).....21

<u>Durr v. Sec'y, Dep't of Veterans Affs.</u>, 843 F. App'x 246 (11th Cir. 2021) ............18

<u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361 (11th Cir. 2000) ...........................................22

<u>EEOC v. Sears Roebuck & Co.</u>, 417 F.3d 789 (7th Cir. 2005)................................24

<u>Embry v. Callahan Eye Found. Hosp.</u>, 147 Fed.Appx. 819 (11th Cir. 2005) .........41

Gee v Principi, 289 F.3d 342 (5th Cir.2002) ...........................................................36

Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261 (11th Cir. 2008) ..............40

Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821 (11th Cir. 2000) ..........29

Holly v. Clairson Indus., LLC, 492 F.3d 1247 (11th Cir. 2007) .......................22, 23

Jones v. Bernanke, 557 F.3d 670 (D.C. Cir. 2009)...................................................35

Jones v. UPS Ground Freight, 683 F.3d 1283 (11th Cir. 2012) ..............................13

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997)........................42

Kewley v. Dep't of Health and Human Servs., 153 F.3d 1357 (Fed. Cir. 1998).....34

Malone v. United States Attorney General, 858 Fed.Appx. 296 (11th Cir. 2021)....18

Marano v. Dep't of Justice, 2 F.3d 1137 (Fed. Cir. 1993) .......................................35

Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002)...........................................35

O'Dell v. Department of Public Welfare of Pennsylvania, 346 F.Supp.2d 774
    (W.D. Pa. 2004) ...............................................................................................25

Olmsted v. Taco Bell Corp., 141 F.3d 1457 (11th Cir. 1998)...........................40, 41

Papelino v. Albany, 633 F.3d 81 (2d Cir. 2011).......................................................35

Porter v. California Dep't of Corr., 419 F.3d 885 (9th Cir. 2005) ..........................42

Price v. Thompson, 380 F.3d 209 (4th Cir. 2004).....................................................42

Ray v. Kroger Co., 2003 WL 230118292 (11th Cir. Dec. 17, 2003) ......................21

Reed v. Heil Co., 206 F.3d 1055 (11th Cir. 2000)....................................................21

Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798 (11th Cir.
    2010) ...............................................................................................15, 28, 37

<u>Samson v. Federal Express Corp.</u>, 746 F.3d 1196 (11th Cir. 2014)..................21, 22

<u>Setelius v. National</u>, 2014 LEXIS 134789, *68 (ED NY Sept. 24, 2014)..............35

<u>Simmons v. Camden County Bd. Of Educ.</u>, 757 F.2d 1187(11th Cir. 1985)..........40

<u>Smith v. Chicago Bridge & Iron Co., N.V.</u>, 2017 WL 2619342 (S.D. Tex. June 16, 2017)........................................................................................36

<u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321 (11th Cir. 2011)........................15

<u>Taylor v. Phoenixville School District</u>, 184 F.3d 296 (3d Cir. 1999) ....................25

<u>Terrell v. USAir</u>, 132 F.3d 621 (11th Cir. 1998)....................................................20

<u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981) ............................19

<u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361 (11th Cir. 2007)..................27, 40

<u>Tonkyro v. Sec'y, Dep's of Veterans Affs.</u>, 995 F.3d 828 (11th Cir. 2021).....16, 27

<u>Varnedoe v. Postmaster Gen.</u>, 2022 WL 35614 (11th Cir. Jan. 4, 2022)..........30, 38

<u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F. 3d 1453 (11th Cir. 1998)....................41

<u>Wright v. Southland Corp.</u>, 187 F.3d 1287 (11th Cir. 1999)..................................37

**<u>Statutes</u>**

5 U.S.C. § 2302(a)(2)(A) ............................................................................28, 29, 30

28 U.S.C. § 1291 ........................................................................................................7

42 U.S.C. § 2000e-16(a)...........................................................................................17

42 U.S.C. § 12111(8) ...............................................................................................21

42 U.S.C. § 12112(b( ...............................................................................................23

29 C.F.R. §1630.2(n)(1).............................................................................21

29 C.F.R.1630.2(o)(iii)..............................................................................24

**<u>Rules</u>**

Fed. R. Civ. P. 56....................................................................................14

## **STATEMENT OF JURISDICTION**

This case is a plenary appeal of a final decision of a district court of the United States, specifically, the United States District Court for the Northern District of Florida, Tallahassee Division. Accordingly, jurisdiction lies under 28 U.S.C. § 1291. Appellant timely filed her Notice of Appeal on August 3, 2023 [Doc. 45], following entry of the District Court's Orders Granting the Motions for Summary Judgment, and the Final Judgment entered on July 5, 2023. [Docs. 36, 42, 43].

## <u>STATEMENT OF THE ISSUES</u>

I.    Whether the District Court erred by finding that Boyd did not establish a *prima facie* case of race, gender, and age discrimination.

II.   Whether the District Court erred by finding that Boyd was not a qualified individual with a disability.

III.  Whether the District Court erred by finding that Boyd was not discriminated against or denied accommodation because of her disability.

IV.   Whether the District Court erred by finding that Boyd was not the victim of retaliation.

V.    Whether the District Court erred by finding that Boyd could not establish a causal connection between her protected activity and the numerous personnel actions she experienced in response.

VI.   Whether the District Court erred by finding that Boyd could not establish a causal connection because her supervisors and the decisionmakers were unaware of her protected activity.

VII.  Whether the District Court improperly weighed the evidence or viewed the evidence in a light most favorable to Appellees.

VIII. Whether the District Court erred by finding that there were no material facts in dispute precluding the entry of summary judgment.

1

## **STATEMENT OF THE CASE**

Plaintiff/Appellant, Teresa Boyd, filed her complaint below on June 4, 2021, against Defendant/Appellee, Louis DeJoy, Postmaster General of the United States. [Doc. 1]. In that complaint she set forth causes of action for race and gender discrimination, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000e et seq. and 42 U.S.C. §1981; another cause of action for disability discrimination brought pursuant to the Rehabilitation Act, codified at 29 U.S.C. §794 et seq and 42 U.S.C. §1981a; and final cause of action for age discrimination pursuant to the Age Discrimination in Employment Act (ADEA), codified at 29 U.S.C. §621 et seq. [Id.]. Appellee answered the complaint on August 13, 2021. [Doc. 5].

Appellee filed its first Motion for Summary Judgment on May 5, 2022. [Docs. 14 and 15]. Appellee filed an Amended Motion on May 11, 2022. [Doc. 18]. Boyd responded in opposition on June 10, 2022. [Docs. 23 and 24]. Appellee replied on June 18, 2022. [Doc. 25].

On September 16, 2022, Appellee filed a Notice of Supplemental Authority and moved to re-brief its summary judgment motion without the submission of new evidence. [Doc. 33]. Although Boyd opposed the Motion [Doc. 35], the District Court granted Appellee's Motion for Summary Judgment, in part, on March 31, 2023. [Doc. 36]. The court dismissed Boyd's discrimination claims, but denied the

motion as to the retaliation claim. [Id.]. The court instructed Boys to file a notice "clearly laying out each adverse action upon which she bases her retaliation claim, along with the protected activity for which she contends that adverse action constituted retaliation," which she did. [Doc. 26, pg. 14; Doc. 37].

Appellee was then granted leave to file a new summary judgment motion, which he did on May 4, 2023. [Doc. 26, pg. 16; Doc. 38; Doc. 39]. Boyd responded in opposition on May 25, 2023. [Doc. 40]. Appellee replied on June 2, 2023. [Doc. 41].

The District Court then granted the second Motion for Summary Judgment on July 5, 2023, dismissing Boyd's remaining retaliation claim. [Doc. 42; Doc. 43]. Boyd then timely appealed. [Doc. 45].

## STATEMENT OF THE FACTS

Boyd, a sixty-one year old black female, began working for the United States Post Office ("Appellee" or "USPS") in 1998. [Doc. 23-13, ¶ 1-2; Doc. 23-14, p. 9]. Boyd became a letter carrier at the Lake Jackson station in 2003 and became a full-time carrier technician in 2010. [Doc. 23-13, ¶ 2; Doc. 23-14, p. 10-11]. As a carrier technician, Boyd cases mail, drives a mail truck and delivers mail and packages. [Doc. 23-13, ¶ 4; Doc. 23-15, p. 24-25]. In addition, in 2018 became the union president, and still holds that office. [Doc. 23-13, ¶ 6; Doc. 23-14, p. 17].

For fifteen years, while working at Lake Jackson, Boyd parked her vehicle in front of the building. [Doc. 23-13, ¶ 3; Doc. 23-14, p. 106]. Prior to May 21, 2020, no supervisor instructed her to park in a different location. [Id.].

On February 2, 2015, Boyd was involved in a motor vehicle accident while on duty and suffered a neck and back sprain. [Doc. 23-13, ¶ 7; Doc. 23-14, p. 171-172; Doc. 23-5]. The claim was numbered OWCP 062350987. [Id.]. Immediately after the accident, Boyd resumed her regular duties full-time with a weight-lifting restriction. [Doc. 23-13, ¶ 8; Doc. 23-14, p. 241-242; Doc. 23-5].

On October 26, 2016, Boyd was involved in another vehicle accident while on duty, resulting in a fractured right middle finger, ulnar nerve damage, and a nose contusion. [Doc. 23-13, ¶ 9; Doc. 23-14, p. 170-172; Doc. 23-5]. The claim was numbered OWCP #062382949. [Id.]. After her second injury, Boyd's supervisors told her that there were no assignments available that fit within her medical restrictions. [Doc. 23-13, ¶ 10; Doc. 23-14, p. 241-242; Doc. 23-5]. Boyd thus remained out of work between October 25, 2016, through November 2017. [Id.]. While reviewing OWCP #62382949, Boyd read notes in the file stating that Postmaster Ed Miller did not want Boyd to return. [Doc. 23-13, ¶ 12; Doc. 23-14, p. 198-199; Doc. 23-5]. Regardless, Boyd returned to full-time status with a weight-lifting restriction in late October or early November 2017. [Doc. 23-13, ¶ 13; Doc. 23-14, p. 188].

4

In October 2017, Boyd filed an EEO complaint against Vanessa Cobb. [Doc. 23-13, ¶ 14; Doc. 23-14, p. 109-110; Doc. 23-9; Doc. 23-10]. In her complaint, Boyd alleged that Cobb engaged in discrimination and retaliation against Boyd because of her age and disability, by refusing to return her to work. [Id.]. Cobb's own husband, however, worked full-time while on limited duty. [Id.]. Of significance, after Boyd filed her EEO complaint, Cobb was transferred out of Tallahassee and did not return to Boyd's chain of command until May 21, 2020. [Doc. 23-14, p. 108-110]. Moreover, in addition to her own complaints, Boyd has filed EEO complaints on behalf of other employees. [Doc. 23-13, ¶ 18; Doc. 23-14, p. 20-21, 108-109].

Because of her injuries, Boyd cannot lift more than twenty-five pounds. [Doc. 23-13, ¶ 16; Doc. 23-14, p. 224-225, 247-248; Doc. 23-5]. Boyd also suffers from flare-ups of her injuries, causing her pain and stiffness, making it difficult to turn her head. [Id.]. However, the flare-ups only last two to three days, during which time Boyd cannot drive. [Id.]. Critically, however, Boyd knows in advance and before she arrives at work when she is having a flare-up. [Doc. 23-13, ¶ 17]. Her supervisors, however, have never asked her or her doctor what happens during a flare-up. [Id.].

In May 2019, Boyd suffered a flare-up of her ulnar nerve. [Doc. 23-13, ¶ 19; Doc. 23-14, p. 209-210, 223-225; Doc. 23-5]. Her physician thereafter restricted her from driving a mail truck until June 2019. [Id.]. Although she was then cleared to

drive, Appellee refused to allow Boyd to resume her regular duties, instead, assigning her to full-time limited duty. [Doc. 23-13, ¶ 20; Doc. 23-14, p. 189-190; Doc. 23-5].

On or around August 29, 2019, supervisor Waylon Morrison instructed a carrier to request time records through Boyd, as union representative. [Doc. 23-13, ¶ 21; Doc. 23-15, p. 4-7; Doc. 23-37]. She did as instructed, but Morrison refused the request and ordered Boyd to return to her duties. [Doc. 23-13, ¶ 22; Doc. 23-15, p. 4-7; Doc. 23-37]. Boyd complied, but Morrison then interrupted a conversation between Boyd and another carrier, ordering Boyd to clock out and go home. [Doc. 23-13, ¶ 23; Doc. 23-15; Doc. 23-37]. Boyd was officially placed on Emergency Placement ("EP") at that time, and she was denied pay as a result. [Id.].

Per the contract, EP is issued for three reasons: causing injury; being intoxicated while on duty; or for the safety of the Post Office. [Doc. 23-13, ¶ 24; Doc. 23-14, p. 61-62]. Although Boyd did not fall into any category, Morrison placed Boyd on EP anyway. [Doc. 23-13, ¶ 25]. She was able to return full time, to limited duty, on August 30, 2019. [Doc. 23-13, ¶ 26; Doc. 23-15; Doc. 23-37].

Thereafter, on October 22, 2019, Boyd again presented Morrison with several requests for information ("RFI"). [Doc. 23-13, ¶ 27; Doc. 23-14, p. 42-43]. Normally, supervisors acknowledge receipt by signing the carbon-copy RFI. [Doc. 23-13, ¶ 28; Doc. 23-14, p. 44-46]. The union retains the yellow sheet while leaving

6

the white with the supervisor. [Id.]. The supervisor then has seventy-two hours to provide the information requested. [Id.]. After submitting the RFI to Morrison, Boyd was called to the area near Morrison's desk, and she inquired about the status of the RFI. [Doc. 23-13, ¶ 29; Doc. 23-14, p. 42-47]. Morrison responded that he had seventy-two hours, and then ordered Boyd back to her workspace. [Id.]. She complied, and left the RFI with Morrison to complete. [Id.].

Boyd was then scheduled to work at a different station, and she visited Morrison prior to that assignment to retrieve the RFI and deliver a new one. [Doc. 23-13, ¶ 30; Doc. 23-14, p. 48-50]. In response, Morrison slammed his hand down so hard on his desk that Boyd jumped in fear. [Id.]. Morrison then ordered Boyd off the clock again, placing her back on EP. [Doc. 23-13, ¶ 31; Doc. 23-14, p. 48-51; Doc. 23-28].

When she reached her car, Boyd realized that her keys were still inside the post office. [Doc. 23-13, ¶ 32; Doc. 23-14, p. 51-54; Doc. 23-16, p. 49]. She requested assistance, but after waiting some time, Boyd entered the station to retrieve her keys and manager Matthew Staley threatened to call the police. [Id.]. During the investigation that followed, Staley claimed that Boyd's behavior was unprofessional and improper, that her body language was tense, and that the incident "could have" caused disruption on the workroom floor, justifying Boyd's placement on EP. [Doc.

23-16, p. 43-44; Doc. 23-11]. Staley also claimed that it was "unproven" that Boyd was intoxicated, but he had heard rumors. [Doc. 23-16, p. 43-46; Doc. 23-11].

On October 25, 2019, Boyd began an EEO complaint regarding the October 22, 2019, incident, alleging race, gender, age and disability discrimination. [Doc. 23-13, ¶ 35; Doc. 23-7]. She then returned to work on October 26, 2019, purportedly for a fact-finding related to the 10/22/2019 incident. [Doc. 23-13, ¶ 36; Doc. 23-14, p. 55-56, 60-65; Doc. 23-28; Doc. 23-29; Doc. 23-30]. Instead, Morrison refused to complete the fact-finding, telling Boyd that no limited duty assignments were available. [Id.]. On November 14, 2019, Appellee notified Boyd that she would receive a fourteen-day no-time-off suspension as a result of the October 22, 2019, incident. [Doc. 23-13, ¶ 37; Doc. 23-14, p. 66-67; Doc. 23-31].

Of critical significance, Boyd filed grievances both for being placed on EP status and the suspension. [Doc. 23-13, ¶ 38; Doc. 23-14, p. 67-74; Doc. 23-32; Doc. 23-33]. Both grievances were upheld, expunging all discipline against Boyd. [Id.]. Regardless, despite submitting numerous medical forms releasing her to work her regular, full-time duties, albeit with a lifting restriction, Appellee refused to provide Boyd with any assignments after October 26, 2019. [Doc. 23-13, ¶ 39; Doc. 23-14, p. 197-202, 244-245; Doc. 23-5].

On December 12, 2019, Boyd went to the Centerville station to meet with union members. [Doc. 23-13, ¶ 40; Doc. 23-15, p. 86-87; Doc. 23-1]. After setting

8

up, Boyd was informed that she was not allowed on postal property and that she had to leave. [Id.].

After contacting OWCP, Linda Bedrosian informed Boyd that Appellee would offer Boyd a full-time limited duty assignment. [Doc. 23-13, ¶ 41; Doc. 23-14, p. 245-246; Doc. 23-15, p. 38, 57]. However, on February 11, 2020, Morrison offered Boyd a limited duty assignment of approximately one and a half hours per day, in which her only duties would be to case mail delivered by other employees. [Doc. 23-6; Doc. 23-13, ¶ 42; Doc. 23-14, p. 81-85, 244-245]. Importantly, those employees were younger while males. [Id.]. Boyd had no choice but to accept the assignment to retain her employment. [Doc. 23-13, ¶ 43-44].

Appellee claims that Boyd is unable to perform the essential functions of her position because doctors say Boyd cannot drive a mail truck. [Doc. 23-17, p. 34-35; Doc. 23-16, p. 8-9, 33]. However, Boyd's doctor cleared her to drive except during flare-ups. [Doc. 23-17, p. 34-35, 45-46, 48-49; Doc. 23-16, p. 8-9, 14-16, 33, 34-37]. Regardless, Appellee claims that she is a safety risk driving at all, yet Boyd was never questioned about her condition or flare-ups, and no one ever requested additional information from Boyd's doctors. [Id.]. Staley refused to acknowledge Boyd was cleared to work and drive, based solely on his claim that Boyd's medical forms were incorrectly completed by the doctor. [Doc. 23-16, p. 13-16, 22-23, 35-

36]. Staley, however, never requested that the doctor complete the forms in any other manner. [Id.].

On May 15, 2020, after Boyd clocked out, Paul Steele interrogated Boyd about where she parked her vehicle. [Doc. 23-13, ¶ 47; Doc. 23-14, p. 106-107]. Because she was off the clock, Boyd asked Steele to stop, and she left the facility. [Doc. 23-13, ¶ 46; Doc. 23-14, p. 101-106]. Although he questioned her about the location of her vehicle, Steele did not instruct Boyd about where to park. [Id.].

On May 21, 2020, the Lake Jackson station experienced a power outage. [Doc. 23-13, ¶ 48; Doc. 23-14, p. 108-110, 116-125]. While employees were relocated outside, Steele and acting station managers Vanessa Cobb and Sammayyah Rattley Assalam approached Boyd. [Id.]. Cobb asked Boyd where she parked her vehicle, and Boyd told her that she was parked in the front of the building, as she had for fifteen years. [Doc. 23-13, ¶ 49; Doc. 23-14, p. 108-110, 116-125]. Cobb began screaming at Boyd to move her vehicle to the employee lot and told her that she was not allowed to park in the front. [Id.]. Importantly, younger, white, and male employees have cursed at and threatened supervisors on the workroom floor but have not been issued any form of discipline. [Doc. 23-13, ¶ 63; Doc. 23-14, p. 20, 78-80, 88-89; Doc. 23-25, p. 12-16].

After Cobb started yelling, Boyd was so upset that she became physically ill and told supervisors she was going home. [Doc. 23-13, ¶ 50; Doc. 23-14, p. 108-

110, 116-125]. Cobb screamed at Boyd to bring medical documentation to prove her illness. [Id.]. Critically, this was Cobb's first day supervising Boyd since her transfer following Boyd's 2017 EEO complaint about Cobb. [Doc. 23-13, ¶ 48-49; Doc. 23-14, p. 108-110, 116-125]. Boyd also overheard Steele ask Cobb if she told Boyd to bring medical documentation. [Doc. 23-13, ¶ 51; Doc. 23-14, p. 108-110, 116-125].

The following day, Boyd returned to work with her medical documentation, but Cobb refused to acknowledge or accept it. [Doc. 23-13, ¶ 52; Doc. 23-14, p. 131-135; Doc. 23-34]. She again placed Boyd on EP status. [Id.]. Boyd then amended the EEO complaint she began in October 2019 to include the May 2020 incidents. [Doc. 23-13, ¶ 53; Doc. 23-27]. Following that amendment, on July 8, 2020, Boyd received a notice of removal for the May 21, 2020, incident. [Doc. 23-13, ¶ 55; Doc. 23-14, p. 143-144; Doc. 23-36].      She was then ordered away from the station as soon as her shift ended, and she was banned from entering any other post office in Tallahassee by postmaster Camille Moscgro-Calvo. Doc. 23-13, ¶ 64; Doc. 23-14, p. 35-36; Doc. 23-15, p. 30-33; Doc. 23-26, p. 5-9]. No other employee was expected to leave or was barred from other facilities. [Id.]. Boyd has also been subjected to verbal abuse, threats, and harassment by supervisors. [Doc. 23-13, ¶ 66; Doc. 23-8].

Boyd grieved both the EP status, as well as the removal, and once again, all discipline was expunged. [Doc. 23-13, ¶ 56; Doc. 23-14, p. 143-146; Doc. 23-35].

Appellee made no effort to determine if any other employee was parked in front of the Lake Jackson station on May 21, 2020. [Doc. 23-18, p. 47-48; Doc. 23-19, p. 25]. Per policy, no employee can park in the LLV lot, but supervisors at Lake Jackson regularly park there, including Cobb and specifically on May 21, 2020. [Doc. 23-18, p. 44; Doc. 23-19, p. 25-26; Doc. 23-20, p. 22-26]. In fact, Boyd's chain of command openly boasted amongst themselves about Boyd's discipline and removal. [Doc. 23-2; Doc. 23-3]. The decision to expunge her discipline was not received well. [Doc. 23-4].

Boyd returned to the one and a half hour limited duty assignment in September 2020. [Doc. 23-13, ¶ 59; Doc. 23-14, p. 142-143]. She has provided medical forms releasing her to work her full time original position, albeit with a twenty-five pound lifting restriction, but Appellee refuses to return Boyd to her regular delivery assignment. [Doc. 23-13, ¶ 60; Doc. 23-17, p. 46].

Importantly, younger, white employees and men have been assigned to full-time limited duty tasks, but continues to refuse Boyd the same assignment. [Doc. 23-13, ¶ 61; Doc. 23-14, p. 31, 109-110; Doc. 23-15, p. 17-20; Doc. 23-20, p. 5-15; Doc. 23-21, p. 5-7; Doc. 23-22, p. 5-15, 21-23; Doc. 23-18, p. 13-14; Doc. 23-24, p. 49, 51, 56, 59-60; Doc. 23-23, p. 6-15]. This included white employees, Glory Lajuski and Tammy Sheffield.

In addition, there are routes available for Boyd to work, but instead, Appellee utilizes younger, white and male carriers accrued overtime to perform those deliveries. [Doc. 23-13, ¶ 62; Doc. 23-20, p. 16-19; Doc. 23-21, p. 8-13; Doc. 23-23, p. 6-15]. In fact, Boyd is the only employee at Lake Jackson for which Appellee cannot find full-time work. [Doc. 23-24, p. 61].

## STANDARD OF REVIEW

The standard of review of an entry of summary judgment is de novo. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1291 (11th Cir. 2012).

## SUMMARY OF ARGUMENT

The District Court erred by finding that Boyd was unable to establish a *prima facie* case of discrimination based on her race, gender, and age. The court then erred by finding that she was unable to establish a *prima facie* case of disability discrimination, because she was unable to perform the essential functions of her position and there was no reasonable accommodation available. The District Court finally erred by finding Boyd did not establish a *prima facie* case of retaliation, because she could not establish a causal connection between her protected activities and the personnel actions she experienced, and she did not establish that the decisionmakers were aware of her protected activity. As shown herein, these findings were error, as was the District Court's orders granting summary judgment. This Court should thus reverse the orders and remand for further proceedings.

# ARGUMENT

"Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." Tippens v. Celotex, 805 F.2d 949, 952-53 (11th Cir. 1986). Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact ***and*** the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

In deciding whether a genuine issue of material fact exists, courts must accept the truth of an appellant's allegations and evidence and "must draw all reasonable inferences in [an a]ppellant's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).

In order to withstand a summary judgment motion, the non-moving party must establish that based on the evidence in the record there can be more than one reasonable conclusion as to the proper verdict. Anderson, 477 U.S. at 250. This Court has further explained that in assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Burton v. City of Belle Glade, 178

14

F.3d 1175, 1187 (11th Cir. 1999) (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982) (citations omitted). In ruling on a motion for summary judgment, the court "may not weigh conflicting evidence or make credibility determinations of [its] own. If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." Jones, 683 F.3d at 1292 (citations omitted).

Moreover, in the employment law context, a plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. Smith v. Lockheed-Martin Corporation, 644 F.3d 1321, 1328 (11th Cir. 2011). Here, however, the District Court commented that "[o]ne problem in this case - and frequently present in other employment cases - is that the plaintiff's presentation of the facts does not clearly set out which facts go with which claims." [Doc. 36, pg. 2]. The court further stated that "in this case and others, we are left with a smattering of facts and a hope that something might stick." [Doc. 36, pg. 3]. As set forth below, this view of the facts, clearly favoring Appellee, ignores the critical directive to view evidence of discrimination and retaliation as a whole picture, and not each individual component in a vacuum, severed from the bigger picture establishing illegal workplace activity. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) ("[W]orkplace conduct cannot be viewed in isolation, but rather is to be viewed

cumulatively, and in its social context.”). As shown below, the District Court erred,

and summary judgment is due to be reversed.

## I. THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON BOYD'S DISCRIMINATION CLAIMS, FINDING THAT SHE DID NOT ESTABLISH A PRIMA FACIE CASE FOR EACH PROTECTED CLASS.

Boyd brought claims for race and sex discrimination pursuant to Title VII;

disability discrimination under the Rehabilitation Act, and age discrimination

pursuant to ADEA. As an initial matter, the District Court properly found that there

was no evidence of any “refusal to cooperate in good faith” with the reviewing

agency, and thus no reason to dismiss Boyd's claims for failure to exhaust her

administrative remedies. [Doc. 36, pg. 6, citing Brown v. Snow, 440 F.3d 1259, 1264

(11th Cir. 2006)]. The court erred, however, finding that she did not establish *prima*

*facie* cases of discrimination based on race, gender, and age.

### A. The District Court erred by granting summary judgment on Boyd's race, sex, and age discrimination claims.

The District Court noted that to prevail on her race- or sex-based Title VII

discrimination claims or her age-based ADEA discrimination claims, Boyd must

show that (1) she suffered an adverse employment action and (2) discrimination

impacted the making of the adverse employment decision. Babb v. Wilkie, 140 S.

Ct. 1168, 1174 (2020) (“Babb I”). In other words, she must show that race, age, or

sex was a “motivating factor” in the USPS's adverse action against her. See Tonkyro

v. Sec'y, Dep's of Veterans Affs., 995 F.3d 828, 836 (11th Cir. 2021). The court continued that "[a]t the hearing, Boyd limited herself to one adverse action: that the USPS refused to give her a light-duty assignment from 2016 through the time of that hearing, and she was only allowed to work 1.5 hours per day." [Doc. 36, pg. 8].

However, despite presenting evidence that white employees were placed on light duty assignments, the District Court erred, finding that Boyd's claims were due to be dismissed because she did not develop any argument that any of the white employees was "otherwise similarly situated to her." [Doc. 36, pg. 8]. Curiously, however, the court acknowledged that McDonnell Douglas was not at issue, and that she need not satisfy the Lewis factors establishing that comparators are "similarly situated in all material respects. [Doc. 36, pgs. 7, 9, citing Babb v. Sec'y, Dep't of Veterans Affs., 992 F.3d 1193, 1204-05 (11th Cir. 2021) (Babb II)]. Ultimately, the District Court concluded that that there was no evidence from which a jury could conclude that USPS's refusal to provide a light-duty assignment was based on Boyd's race, sex, or age. [Doc. 36, pg. 9]. This was error.

First, the plain language of 42 U.S.C. § 2000e-16(a), directs that a plaintiff seeking to bring a federal-sector Title VII claim need only show that the challenged personnel action was not free of any discrimination based on a protected characteristic, or, put another way, that the decision was "tainted". If there is a taint of discrimination, then § 2000e-16(a) imposes liability. The traditional

McDonnell Douglas analysis does not apply. See Durr v. Sec'y, Dep't of Veterans Affs., 843 F. App'x 246, 247 (11th Cir. 2021) (holding that a plaintiff suing under the federal-sector provision of Title VII is no longer required to show that his protected characteristic was the but-for cause of an adverse action; rather, he need only show that discrimination played any part in the way the decision was made.); Malone v. United States Attorney General, 858 Fed.Appx. 296 (11th Cir. 2021) (per curiam) (explaining that, after Babb I and Babb II, a plaintiff need only show that discrimination was a factor in the challenged employment action to state a cognizable claim under the federal-sector provision of Title VII). Thus, Boyd need only show that the refusal to provide her with a light-duty position and allowing her to only work one and a half hours each day were decisions "tainted" with discrimination.

Boyd easily meets this lowered burden. She was fifty-nine years old at the time she was dismissed, and to this day, Boyd is denied the ability to perform her regular route, instead having to turn her deliveries over to much younger white and/or male carriers

Moreover, even though she is not required to show comparators, she can identify similarly situated individuals who were treated more favorably. Here, Boyd was disciplined, placed on EP, and dismissed for alleged aggression to supervisors, while Boyd personally witnessed younger, white, and/or male employees curse at

and threaten supervisors on the workroom floor without any form of discipline. In addition, younger, white and/or male supervisors verbally abused Boyd herself, screaming at her in front of coworkers, and threatening her multiple times, including threats to call the police on Plaintiff, but those supervisors were not investigated or disciplined for their misconduct.

Plaintiff was denied a full-time limited duty assignment, with supervisors claiming there is no work available for her. Yet, supervisors found assignments for younger, white and/or male employees who were also injured on the job. Cobb's husband, John Cobb, has worked full-time limited duty for years, while Boyd is denied the same opportunity.

Boyd was placed on EP and terminated over a parking spot that she had used for more than fifteen years without issue and about which no supervisor ordered her to vacate. No other employee was disciplined, harassed, or screamed at for parking in the front of the building. Moreover, supervisors themselves were improperly parked in the LLV lot, against safety policies, but were not disciplined or terminated.

Boyd's burden at this stage is not onerous. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). The District Court thus erred by finding that she failed to establish that the decisions to take numerous personnel actions against her tainted by discrimination. This Court should thus reverse the District Court's order.

**B.      The District Court erred by granting summary judgment on Boyd's disability discrimination claim.**

To establish a *prima facie* case of disability discrimination, a plaintiff must establish "(1) that [Boyd] has a disability; (2) that, with or without reasonable accommodations, she can perform the essential functions of the position she holds; and (3) that she was discriminated against because of her disability." Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998). The standard for determining liability under the Rehabilitation Act is the same as that under the ADA. See Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1224 n. 2 (11th Cir. 2005). The first element was not in dispute below. [Doc. 36, pg. 9].

The District Court's analysis focused on the essential functions of Boyd's position, as well as her accommodation requests. The parties agree that driving a mail truck is an essential function of Boyd's original position as a mail carrier. However, the District Court found that there was ambiguous medical documentation regarding Boyd's medical limitations and she did not inform Appellee that she experienced flare-ups rarely and could anticipate them in advance. [Doc. 36, pg. 10]. The court also found that Boyd never asked for an alternate position, only that she be allowed to return to her original position. [Doc. 36, pg. 11]. Finally, the District Court found that it would be unreasonable to create a new position for Boyd, although Boyd did not ask for a "new" position, she asked for a light-duty

20

assignment or to be returned fully to her original position, except on the rare occasions she had flare-ups that prevented her from driving temporarily. Regardless, each of these conclusions is erroneous, and addressed below.

As an initial matter, a plaintiff is a "qualified individual" if he "with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." 42 U.S.C. § 12111(8). A plaintiff must establish that she is a qualified individual under a two-prong test: (1) she has the prerequisites for the job; (2) she can perform the "essential functions" of the job with, or without, reasonable accommodation. See Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000); see also Downing v. United Parcel Service, Inc., 215 F.Supp.2d 1303, 1309-10 (M.D. Fla 2002). "Essential functions are the fundamental job duties of the employment position, but do not include the marginal functions of the position." Samson v. Federal Express Corp., 746 F.3d 1196, 1200 (11th Cir. 2014) (quoting 29 C.F.R. §1630.2(n)(1)). Although an employer's judgment and written description of duties are taken into consideration, the determination of what is an essential function is a factual query and examined on a case-by-case basis. Samson, 746 F.3d. at 1200-01; see also, Ray v. Kroger Co., 2003 WL 230118292 at *3 (11th Cir. Dec. 17, 2003). The Eleventh Circuit reiterated the necessity of examining the actual duties with regards to the claimed essential functions – that if all employers were granted complete deference to claimed essential functions, they could easily escape the

mandates of providing reasonable accommodations to their disabled employees. See Samson, 746 F.3d at 1201 (quoting Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1285 (11th Cir. 2007)). In the end, where there remains conflicting record evidence, whether a certain duty is an essential function should be a fact issue resolved by a jury. See Samson, 746 F.3d at 1202.

The record below established that Boyd was fully released to her carrier duties, albeit with a twenty-five pound lifting restriction. She provided extensive medical documentation to Appellee to support her release to full duties. Moreover, Boyd testified that she only receives packages exceeding twenty-five pounds once or twice a week, and that other carriers assist in lifting the packages or delivering them. Moreover, there is evidence that other carriers have similar restrictions and receive similar accommodations, that is, occasional assistance from other carriers.

Appellee insists that Boyd is unable to drive, which is directly contradicted by her testimony and the medical evidence. Boyd is only temporarily unable to drive during her rare flare-ups. She knows when those flare-ups are about to happen and they last just a few days.

A reasonable accommodation is one that would allow someone with a disability to do the job. Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) ("An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job."). Here, there was

no reason to restrict Boyd to working just one and a half hours per day, other than blatant discrimination. There is no evidence that allowing another employee to help Boyd on the few occasions she received a heavy parcel would be an unreasonable accommodation. Moreover, there is no evidence whatsoever that allowing Boyd to temporarily work in another role or use her leave during her rare flare-ups would be unreasonable. See Holly, 492 F.3d at 1262 (holding failure to provide accommodation is itself unlawful discrimination); see also, 42 U.S.C. § 12112(b).

Moreover, other employees continue to work full-time limited duty for years, including John Cobb. Other employees deliver routes with lifting restrictions and receive help lifting anything over their restrictions. Appellee insists that there is no full-time work for Boyd simply because they want Boyd gone. Indeed, there is evidence in Boyd's workers' compensation file that her supervisors informed OWCP workers that they did not want Boyd to return. Moreover, Appellee continues to intentionally misread Boyd's medical documentation to support their claim to terminate her. Plaintiff was able to perform the essential functions of her position, with accommodation, including something as having assistance to lift anything more than twenty-five pounds or the ability to use her leave during flare-ups of her neck and back strain. See Holly, 492 F.3d at 1249, 1262 (holding failure to provide accommodation is itself unlawful discrimination); see also, 42 U.S.C. § 12112(b).

The regulations that flesh out the obligations of an employer find that it may be necessary for an employer to initiate the interactive process to identify limitations and potential accommodations:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R.1630.2(o)(iii). This rule is the corollary to the "reasonable accommodation requirement – that is, it creates the employer's obligation to engage in an interactive process" with the disabled employee to determine whether and which reasonable accommodations are feasible. See EEOC v. Sears Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005) ("the ADA requires that employer and employee engage in an interactive process to determine the reasonable accommodation"). Simply put, once an employer becomes aware of the need for a reasonable accommodation, it "must make a reasonable effort to determine the appropriate accommodation. The appropriate accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. §1630.2(o)(iii). "Underlying the interactive process is the duty of the parties to act in good faith while searching for appropriate reasonable accommodation."

O'Dell v. Department of Public Welfare of Pennsylvania, 346 F.Supp.2d 774, 785 (W.D. Pa. 2004).

Contrary to the District Court's findings, Boyd established that her employer failed to engage in the interactive process by showing (1) "the employer knew about the employee's disability"; (2) "the employee requested accommodations or assistance for his or her disability"; (3) "the employer did not make a good faith effort to assist the employee in seeking accommodations"; and (4) "the employee could have been reasonably accommodated but for the employer's lack of good faith." Taylor v. Phoenixville School District, 184 F.3d 296 (3d Cir. 1999). Appellee here cannot claim it was unaware of Boyd's disability. Boyd has provided multiple doctor's notes to clarify her restrictions. Second, Appellee knew Boyd needed accommodation for her disability in the form of assistance lifting over twenty-five pounds. In addition, Boyd requested to be returned to her normal delivery route, except during flare-ups, and yet, Appellee intentionally misrepresented Boyd's restriction to claim that Boyd is restricted from driving at all, thereby, claiming that Boyd cannot perform the essential functions of her job. However, no one has made any attempt to obtain clarification of Boyd's restrictions or even to speak with Boyd about the onset of her flare-ups. Instead, Appellee outright refuses to allow Boyd to drive, restricting her to working one and a half hours per day, in an attempt to force Boyd from her employment, something they have wanted since she was injured.

25

Here, the record establishes that Appellee ignored Boyd's medical documentation, and instead, followed their own orders thus refusing Boyd her full-time delivery route, claiming, without evidence, that she was a safety risk. Appellee then claimed that there was no work available for Boyd, forcing her to accept a work assignment of only one and a half hours each day. Meanwhile, other employees were granted full time, light duty assignments. The timeline is critical here: Boyd worked as a full-time carrier between her return in November 2017 through May 2019. Upon her return in June 2019, Boyd continued to work full-time, limited duty. Only after Morrison attempted to discipline her in October 2019, did Morrison and other supervisors suddenly determine there was no work available for Boyd. When pressure by OWCP, Boyd was offered one and a half hours per day.

The trial court erred by finding that Boyd was unable to establish a *prima facie* case of disability discrimination. There is evidence that Appellee failed to accommodate Boyd and failed to engage in the interactive process. There is evidence that despite her medical conditions she was able to perform her duties with only occasional lifting assistance and use of her own leave time as reasonable accommodations. There is evidence that despite her ability to thus perform the essential functions of the role of carrier, she was reduced to a position working less than two hours a day. She was denied the opportunity to switch to a light duty position to work full time. A reasonable jury could easily conclude on these facts

that Appellee used its own opinion about Boyd's medical conditions to push her out of her position, hoping to finally rid itself of her. Summary judgment was thus granted in error, and is due to be reversed.

## II. THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON BOYD'S RETALIATION CLAIM.

To succeed on a Title VII retaliation claim, Boyd must present evidence of (1) her protected expression, (2) a personnel action, and (3) a causal connection between the two. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007). For causation, much like discrimination, federal-sector retaliation claims require showing that retaliation "play[ed] a part" in the personnel action. See Babb I, 140 S. Ct. at 1174 n.3 (describing standard for federal-employee Title VII discrimination claim); Tonkyro, 995 F.3d at 833-35 (applying Babb's more lenient causation standard to federal sector retaliation claims). Here, however, despite this more lenient standard, the District Court incorrectly found that she was unable to establish the elements of her claim, and specifically that Boyd "offers only speculation to connect her protected expressions to any of the incidents she asserts as retaliatory." [Doc. 42, pg. 5]. As shown below, the court erred.

As an initial matter, when the court evaluated her retaliation claim, it declined to address exhaustion on the merits because it found her claim was due to be dismissed. [Doc. 42, pg. 3]. To the extent this Court were to review any issues related

to exhaustion, it should find as the District Court did, that her claims are properly before the Court and all prerequisites satisfied.

As noted above, workplace conduct cannot be viewed in a vacuum, and must "be viewed cumulatively, and in its social context." Reeves, 594 F.3d at 807. It is here the court erred first, cherry-picking events and facts and failing to see the big picture, the ongoing, escalating incidents of discipline, suspension, dismissal, and hour-reduction that began after Boyd made her first protected disclosures and continued from the first moment Cobb was available to retaliate.

As to personnel actions, the District Court did not evaluate each one. Below, Appellee admitted that it issued Boyd various forms of discipline, including placing Boyd on EP status multiple times, issuing Boyd a notice of suspension and issuing Boyd a notice of removal, although Appellee attempts to argue that such actions were not "adverse employment actions." [Doc. 38, p. 25-29].

However, only a "personnel action is required" – not an "adverse employment action." See Babb I, 140 S. Ct. at 1172–73; 5 U.S.C. § 2302(a)(2)(A). Here, placement on EP status, subjecting Boyd to verbal harassment and abuse, including screaming at Boyd and threatening to call the police, interrogating Boyd after she has clocked out from her shift, refusing to allow Boyd into other facilities to enable her to perform union duties, refusing Boyd full-time work, issuing Boyd a notice of suspension and issuing Boyd a notice of removal were not petty, but rather,

28

"might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008) (quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)). Boyd's placement on EP status, removal of full-time status, notice of discipline and notice of removal constituted personnel actions as defined by 5 U.S.C. §2302(a)(2)(A)(iii) and (xii).

Additionally, the refusal to allow Boyd into other facilities to perform union duties affected Boyd's status and responsibility. A change in status may be an adverse employment action if it "involves a reduction in pay, prestige, or responsibility." Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000). Certainly a reasonable person would think twice about filing complaints against a supervisor who could and would alter his or her employment status and refuse her full-time work or to set the person up for termination with false allegations that he or she was aggressive to supervisors.

Moreover, the verbal harassment and abuse to which Boyd was subjected by various supervisors on multiple occasions, included:

    a. On October 22, 2019, when Manager Matthew Staley threatened to call the police on Boyd when she had to reenter the station to retrieve her keys. [23-13, ¶ 32; 23-14, p. 51-54; 23-16, p. 49].

    b. On May 15, 2020, Paul Steele verbally abused and harassed Boyd while Boyd was off the clock. [23-13, ¶ 46; 23-14, p. 101-106].

    c. On May 21, 2020, supervisors, including acting station manager Vanessa Cobb on her first day of supervising Boyd since Boyd filed the 2017 EEO complaint against

her, subjected Boyd to verbal abuse and harassment, screaming at Boyd about where she parked her vehicle. [23-13, ¶ 48-49; 23-14, p. 108-110, 116-125].

d. Boyd became physically ill because of the harassment and verbal abuse, and Cobb demanded that she bring medical documentation before returning to work. [23-13, ¶ 50; 23-14, p. 108-110, 116-125].

e. The following day, Boyd returned to work with her medical documentation, but Cobb refused to acknowledge or accept it, placing Boyd on EP status. [23-13, ¶ 52; 23-14, p. 131-135; 23-34].

Such verbal abuse, harassment, and threats fall within 5 U.S.C. §2302(a)(2)(A)(iii) and (xii) because the actions were disciplinary in nature and because they affected Boyd's working conditions. Here, Boyd was subjected to multiple personnel actions, including verbal harassment, abuse and threats, placement on EP status, removal of full-time work and refusal to reinstate Boyd to full-time status, notice of suspension and notice of removal.

It is against this backdrop of personnel actions that the Court must evaluate causation. In Varnedoe v. Postmaster Gen., No. 21-11186, 5-6 (11th Cir. Jan. 4, 2022), this Court stated:

> In federal-sector cases, of course, *the employee is not required to show that her protected activity was the but-for cause of the adverse action; it is sufficient to show that her protected activity played a role in the adverse action.* Babb, 992 F.3d at 1199, 1205. Moreover, if the employee makes this showing, *the employer cannot escape liability by presenting evidence that it also had nondiscriminatory reasons for its action.* Id. at 1204-05. That is because "even when there are non-pretextual reasons for an adverse employment decision-as the government says

30

> there are here- the presence of those reasons doesn't cancel
> out the presence, and the taint, of discriminatory
> considerations." Id. at 1204.

Id. at 5-6, emphasis supplied. Thus, Boyd need not show but-for causation, at least when "but-for causation" is interpreted as a "sole" cause.

Here, such a causal link is easily established. Based on the record before the Court and in chronological order, the pattern of report and retaliate becomes clear:

Around August 29, 2019, supervisor Waylon Morrison ordered Boyd to clock out and go home; Boyd was officially placed on EP and denied pay, after Boyd filed EEO complaints on her own behalf, as well as for other employees. [Doc. 23-13, ¶ 18, 23, 25; Doc. 23-14, p. 20-21, 108-109; Doc. 23-15; Doc. 23-37].

On October 22, 2019, Morrison placed Boyd on EP status. [Doc. 23-13, ¶ 27-31; Doc. 23-14, p. 42-51; Doc. 23-28].

Manager Matthew Staley then threatened to call the police on Boyd when she had to reenter the station to retrieve her keys on October 22, 2019, after Boyd filed EEO complaints on her own behalf, as well as for other employees. [Doc. 23-13, ¶ 18, 32; Doc. 23-14, p. 20-21, 51-54, 108-109; Doc. 23-16, p. 49].

Boyd returned to work on October 26, 2019, for a fact-finding related to the October 22, 2019, incident, but Morrison refused to complete the fact-finding, telling Boyd that no limited duty assignments were available, preventing Boyd from working at all, after Boyd filed an EEO complaint on 10/ 25/2019. [Doc. 23-13, ¶

35-36; Doc. 23-14, p. 55-56, 60-65; Doc. 23-7; Doc. 23-28; Doc. 23-29; Doc. 23-30].

On November 14, 2019, Appellee notified Boyd that she would receive a fourteen day no-time-off suspension because of the October 22, 2019 incident, and approximately two weeks after Boyd filed her EEO complaint. [Doc. 23-13, ¶ 35, 37; Doc. 23-14, p. 66-67; Doc. 23-7; Doc. 23-31].

Appellee refused Boyd any assignments after October 26, 2019. [Doc. 23-13, ¶ 39; Doc. 23-14, p. 197-202, 244-245; Doc. 23-5].

On December 12, 2019, Boyd was denied entry to Centerville station where she needed to meet with union members. [Doc. 23-13, ¶ 40; Doc. 23-15, p. 86-87; Doc. 23-1].

On February 11, 2020, Morrison refused Boyd a full-time limited duty assignment, and instead, only offered Boyd a limited duty assignment for one and a half hours per day. Morrison was forced to offer Boyd some form of work based on Boyd's OWCP case. [Doc. 23-13, ¶ 41-44; Doc. 23-14, p. 81-85, 244-246; Doc. 23-15, p. 38, 57; Doc. 23-6].

On May 15, 2020, Paul Steele verbally abused and harassed Boyd while Boyd was off the clock. [Doc. 23-13, ¶ 46; Doc. 23-14, p. 101-106].

Backtracking, in October 2017, Boyd filed an EEO complaint against Vanessa Cobb, for discriminating and retaliating against her. After Boyd filed her EEO

complaint, Cobb was transferred out of Tallahassee and did not return to Boyd's chain of command until May 21, 2020. That same day, supervisors, including Cobb on her first day of supervising Boyd since Boyd filed the 2017 EEO complaint against her, subjected Boyd to verbal abuse and harassment, screaming at Boyd about where she parked her vehicle. [Doc. 23-13, ¶ 14, 48-49; Doc. 23-14, p. 108-110, 116-125; Doc. 23-9; Doc. 23-10].

Boyd returned to work, but Cobb placed Boyd on EP status. [Doc. 23-13, ¶ 52; Doc. 23-14, p. 131-135; Doc. 23-34].

Boyd amended her EEO complaint begun in October 2019 to include the May 2020 incidents, including being verbally abused on May 15, 2020, as well as on May 21, 2020, and being placed on EP status on May 22, 2020. On July 8, 2020, Boyd received a notice of removal for the May 21, 2020 incident. [Doc. 23-13, ¶ 53, 55; Doc. 23-14, p. 143-144; Doc. 23-27; Doc. 23-36].

Boyd was ordered from the station as soon as her shift ended, and she has been banned from entering any other post office in Tallahassee by postmaster Camille Moscgro-Calvo. No other employee is expected to leave or barred from other facilities. Boyd has also been subjected to verbal abuse, threats and harassment by supervisors. [Doc. 23-13, ¶ 64, 66; Doc. 23-14, p. 35-36; Doc. 23-15, 30-33; Doc. 23-26, p. 5-9; Doc. 23-8; Doc. 23-36]. The pattern is clear.

33

Appellee also argued below that decision-makers, including Supervisor Morrison, Station Manager Matthew Staley, Station Manager Vanessa Cobb, were unaware of Boyd's protected activity. Significantly, temporal proximity between the individual's engagement in a protected activity and the unfavorable personnel action can be circumstantial evidence that the protected activity was a contributing factor to the adverse employment action. See Kewley v. Dep't of Health and Human Servs., 153 F.3d 1357, 1362 (Fed. Cir. 1998) (noting that, under the Whistleblower Protection Act, "the circumstantial evidence of knowledge of the protected disclosure and a reasonable relationship between the time of the protected disclosure and the time of the personnel action will establish, prima facie, that the disclosure was a contributing factor to the personnel action") (internal quotation omitted). Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152, 160 (3rd Cir. 2013) ("Considering all of the evidence in the light most favorable to Araujo, we conclude that Araujo has asserted a prima facie case. With respect to Araujo's temporal proximity argument, Araujo's evidence is entirely circumstantial, and he does not provide any evidence about NJT's motive. But direct evidence is not required. . . . Thus, Araujo is not required to provide evidence of motive"); Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (noting, in the context of Title VII employment discrimination cases, that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct

evidence"); <u>Marano v. Dep't of Justice</u>, 2 F.3d 1137, 1140, 1141 (Fed. Cir. 1993) (noting, in a case under the Whistleblower Protection Act, that an employee "need not demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action.").

Boyd does not have to show management's knowledge of her protected disclosures by direct evidence. Awareness of the protected activity may also be established by producing circumstantial evidence from which a reasonable jury could infer the decision maker's knowledge. <u>Mulhall v. Ashcroft</u>, 287 F.3d 543, 552 (6th Cir. 2002). A plaintiff may produce circumstantial evidence to establish this element of his claim. <u>See</u> <u>id.</u> And, he "need only offer circumstantial evidence that could reasonably support an inference" that supervisors making a decision about Boyd's employment knew of her protected activity, <u>Jones v. Bernanke</u>, 557 F.3d 670, 679 (D.C. Cir. 2009), and context matters, <u>White</u>, 548 U.S. at 69.

The law does not require the plaintiff to prove that every single employee knew of his race discrimination cases. <u>Papelino v. Albany</u>, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."); <u>Setelius v. National</u>, 2014 LEXIS 134789, *68 (ED NY 9/24/14) ("Plaintiff does not have to prove that specific actors knew of the protected

activity…(provided)… Plaintiff can demonstrate…corporate knowledge."). See also Smith v. Chicago Bridge & Iron Co., N.V., 2017 WL 2619342 at *5 (S.D. Tex. June 16, 2017); Cf. Gee v Principi, 289 F.3d 342, 346-347 (5th Cir. 2002) (direct evidence not required to enable fact finder to conclude that a decisionmaker was influenced by a person with a retaliatory motive). As one court recently explained: retaliation cases must often be proven with "the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." Smith, 2017 WL 2619342 at * 5.

Boyd filed multiple EEO complaints on her own behalf, as well as for other employees. Boyd had such a history of filing complaints against supervisors that Postmaster Ed Miller did not want Boyd to continue her employment with Appellee. [Doc. 23-13, ¶ 12; Doc. 23-14, p. 198-199; Doc. 23-5].

Boyd filed an EEO complaint against Vanessa Cobb in 2017, and as a result, Cobb was transferred out of Tallahassee. Certainly, Cobb was aware of Boyd's protected activity, and used the first chance she could to get even with Boyd, verbally abusing her and harassing her on Cobb's first day back in Tallahassee and first day supervising Boyd since Boyd filed with 2017 EEO complaint against her.

Morrison called Boyd in for a fact-finding scheduled for October 26, 2019, but after Boyd filed her EEO complaint on October 25, 2019, Morrison refused to

36

complete the fact-finding, telling Boyd that no limited duty assignments were available, and therefore, removed Boyd from employment all together. [Doc. 23-13, ¶ 36; Doc. 23-14, p. 55-56, 60-65; Doc. 23-28; Doc. 23-29; Doc. 23-30]. Thereafter, Boyd was issued her notice of suspension, and during the investigation, Staley claimed that Boyd's behavior was unprofessional and improper, that her body language was tense and that the incident "could have" caused disruption on the workroom floor, justifying Boyd's placement on EP. [Doc. 23-16, p. 43-44; Doc. 23-11]. Staley also claimed that it was "unproven" that Boyd was intoxicated, but he had heard rumors. [Doc. 23-16, p. 43-46; Doc. 23-11].

The acts committed against Boyd cannot be viewed in a vacuum; looking at the big picture, Boyd was targeted from the time she first made her complaints until her termination. See Reeves, 594 F.3d at 807. Further, the position of a biased employee within the company may raise an inference that he influenced the termination decision. See Wright v. Southland Corp., 187 F.3d 1287, 1306 n. 26 (11th Cir. 1999) (noting relationship between supervisor and decisionmaker, coupled with numerous consultations between two, raised inference of cat's paw scenario). Appellee is not insulated merely because higher ranking officials and other upper management made the decision while relying on supervisors' recommendations to discipline and to fire Boyd. The misinformation provided by

supervisors, including Miller, Morrison, Staley, Cobb and others affected the decision to discipline and to terminate Boyd.

As described in <u>Varnedoe</u>, Appellee "cannot escape liability by presenting evidence that it also had nondiscriminatory reasons for its action." <u>Varnedoe</u>, at 5-6. On the other hand, Boyd has presented ample evidence that the many personnel actions to which she was subjected were at least partially motivated by Boyd's filing complaints against supervisors, including Morrison and Cobb, for their differential and abusive treatment of Boyd. Because Boyd has shown that at least some of Appellee's decisions carried the taint of retaliation, it is of no matter whether Appellee can prove that some of its decisions were also based on impartial findings.

Appellee also attempts to argue that certain of Boyd's adverse personnel actions are too remote from Boyd's protected activity, and therefore, Boyd cannot show retaliation. First, on February 11, 2020, Morrison refused Boyd a full-time limited duty assignment, and instead, only offered Boyd a limited duty assignment for 1.5 hours per day. [Doc. 23-13, ¶ 42; Doc. 23-14, p. 81-85, 244-245; Doc. 23-6]. Appellee argued below that the action occurred more than three months after Boyd filed her October 25, 2019, EEO complaint. However, Morrison only made the offer after he was forced to give Boyd some form of work through the OWCP case. Previously, Boyd had no work with Appellee since Morrison removed all work duties from Boyd on October 26, 2019. [Doc. 23-13, ¶ 41-44; Doc. 23-14, p. 81-85,

244-246; Doc. 23-15, p. 38, 57; Doc. 23-6]. Given that she was not at work, there was no need or ability to retaliate against her.

Second, on May 15, 2020, Paul Steele verbally abused and harassed Boyd while Boyd was off the clock. [Doc. 23-13, ¶ 46; Doc. 23-14, p. 101-106]. Once again, Appellee argues that the May 15, 2020 incident was too remote from Boyd filing her additional EEO complaint and/or amendments on February 14, 2020. Yet, Appellee and the Court ignored the fact that the harassment and verbal abuse by Appellee's agents was ongoing from the time that she filed her EEO complaint against supervisors in October 2019.

Third, on May 21, 2020, supervisors, including acting station manager Vanessa Cobb on her first day of supervising Boyd since Boyd filed the 2017 EEO complaint against her, subjected Boyd to verbal abuse and harassment, screaming at Boyd about where she parked her vehicle. [Doc. 23-13, ¶ 48-49; Doc. 23-14, p. 108-110, 116-125]. Again, Appellee argues that the adverse personnel actions which occurred on May 21 and 22, 2020 were too remote from Boyd's protected activity performed on October 25, 2019 and February 14, 2020. However, as argued above, Boyd filed her original EEO complaint against Vanessa Cobb in October 2017, and May 21, 2020 was the first day on which Cobb supervised Boyd since the 2017 EEO complaint. Thus, it is proper and reasonable to infer that Boyd's chain of command and the decisionmakers were well aware of her repeated protected activity.

The causal connection is not "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action" that would "rise to the level of direct evidence of discrimination." Simmons v. Camden County Bd. Of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). Rather, this Circuit "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1278 (11th Cir. 2008) (quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). And, where the protected speech and adverse employment action are close in time, causation may be inferred.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("burden of causation can be met by showing close temporal proximity). But the bottom line is that the plaintiff must demonstrate a connection between her protected activity and adverse employment action that could "reasonably support [a] jury's determination." Olmsted, 141 F.3d at 1460.

Boyd was placed on EP in October 2019, and when Boyd began her informal EEO proceedings on October 25, 2019, the following day Morrison suddenly could not find work for Boyd, although she had been working full-time limited duty until Morrison placed her on EP status on October 22, 2019. Two weeks later, Boyd was subjected to suspension for the incident. Then, when Morrison was forced to find work for Boyd because of the OWCP case, Morrison refused to assign Boyd more

than 1.5 hours of work per day, rather than the full-time work Boyd had prior to filing her October 25, 2019 EEO complaint.

Boyd began her EEO proceedings verbally and informally against Vanessa Cobb in 2017. The very first day that Cobb was within Boyd's chain of command, she subjected Boyd to verbal abuse, screaming at Boyd in a parking lot in front of Boyd's coworkers, chasing Boyd from the facility. The following day, Cobb placed Boyd on EP for aggressive behavior, when, it was Cobb who was aggressive. When Boyd grieved the EP placement and amended her EEO proceedings for the discriminatory treatment she experienced by the supervisors at Lake Jackson, supervisors sought Boyd's termination.

When Boyd grieved the Notice of Removal and the differential and retaliatory treatment she continued to experience, supervisors chased her from other facilities that she visited to perform union work, and Boyd is now banned from all other facilities. Boyd filed informal and formal EEO complaints, as well as grievances, against supervisors, but the abuse continued and increased, and Boyd notified EEO personnel after each action.

This timeframe is well within the Eleventh Circuit's precedent for satisfying the causal connection prong. See e.g., Wideman v. Wal-Mart Stores, Inc., 141 F. 3d 1453, 1457 (11th Cir. 1998) (one month sufficient to establish nexus); Olmsted, 141 F.3d at 1460 (four to five months sufficient for causal connection); Embry v.

Callahan Eye Found. Hosp., 147 Fed.Appx. 819, 831 (11th Cir. 2005) (two months between filing charge of discrimination and suspension sufficient to satisfy nexus). A causal connection exists between Boyd's protected activity and the adverse actions she suffered.

To the extent that the court finds that there were any gaps between Boyd's protected speech and adverse action, the adverse actions can be viewed as Appellee's "first opportunity" to retaliate, accounting for any lapse in time between Boyd's protected conduct and the adverse action. See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (holding that plaintiff made prima facie case despite lapse in time in that jury could reasonably conclude failure to hire was the first opportunity to retaliate); Porter v. California Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005) (temporal delay due to fact that harasser unable to exact retaliation until promotion to supervisory position); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that temporal gap may be explained through "valid reasons" that do not disprove causation).

Here, Boyd filed an EEO complaint against supervisors for the October 22, 2019 incident. The day after Boyd filed the complaint, supervisors got rid of Boyd by claiming they could not find her work, and then, supervisors suspended Boyd. Boyd, herself, filed EEOs against Cobb. As a result, Cobb was transferred from Tallahassee. Then, upon Cobb's first day of being placed back at Lake Jackson

within Boyd's chain of command, Cobb verbally abused Boyd and subjected her to discipline which escalated to a Notice of Removal in her attempts to get rid of Boyd.

Given that her burden is "not onerous" and relies upon a far more relaxed standard than a traditional Title VII retaliation case, the District Court erred by finding that Boyd did not establish that she was the victim of retaliation for engaging in repeated and ongoing protected reporting. This Court should thus reverse the District Court's order and remand for further proceedings.

## <u>CONCLUSION</u>

The District Court first erred by finding that Boyd was unable to establish *prima facie* cases of discrimination. The District Court also erred by finding that Boyd was unable to establish a *prima facie* case of retaliation. As shown herein, these findings were error, as were the District Court's orders granting summary judgment. This Court should thus reverse the orders and remand for further proceedings.

Respectfully submitted,

s/ Ashley N. Richardson
Marie A. Mattox
Florida Bar No. 739685
Ashley N. Richardson
Florida Bar No. 42003
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)
ATTORNEYS FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). This portions of this brief which must be counted contain 11629 words.

s/ Ashley N. Richardson
Ashley N. Richardson

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via electronic filing to all attorneys of record, this 22nd day of November 2023.

s/ Ashley N. Richardson
Ashley N. Richardson